## THAD G. CROSSETT V. THE STATE.

### No. 3161.　Decided June 10, 1914.

**1.—Murder—Sufficiency of the Evidence.**

Where, upon trial of murder, the evidence sustained the conviction under a proper charge of the court, there was no reversible error.

**2.—Same—Self-defense—Charge of Court.**

Where, upon trial of murder, the court submitted the law of self-defense, and there was no written objection to said charge during the trial, and the objections were general in their nature without pointing out the error in the charge of the court, and defendant's special charges as requested, which were proper, were submitted, there was no reversible error.

**3.—Same—Rule Stated—Objections to Charge of Court.**

The intention of the Legislature was in passing the Act of April 5, 1913, that an accused on trial must aid the lower court in giving a correct charge instead of taking chances of an acquittal, and then excepting later to the court's charge; besides, the court's charge was correct, and there was no error in not submitting special charges which were already embraced in the main charge, and, besides, the objections were too general in their nature. Distinguishing McMillan v. State, 73 Texas Crim. Rep., 343.

**4.—Same—Rule Stated—Special Charges.**

A mere general abstract proposition not applied to the facts in evidence is not such a special charge which the court should submit.

Appeal from the District Court of Dawson.　Tried below before the Hon. W. R. Spencer.

Appeal from a conviction of murder; penalty, thirty years imprisonment in the penitentiary.

The opinion states the case.

*J. E. Garland* and *W. F. Robinson* and *Cunningham & Oliver* and *W. F. Ramsey* and *C. L. Black,* for appellant.—On question of requested charge on self-defense: McMillan v. State, 73 Texas Crim. Rep., 343, 165 S. W. Rep., 576; Willice v. State, 75 S. W. Rep., 790; Dodson v. State, 45 Texas Crim. Rep., 571; Graves v. State, 58 id., 42; St. Clair v. State, 49 id., 479.

*C. E. Lane,* Assistant Attorney General, for the State.

PRENDERGAST, PRESIDING JUDGE.—Appellant was indicted for the murder of Warren Bullock on January 20, 1914.　He was convicted and his punishment assessed at thirty years in the penitentiary.

On the night of January 20, 1914, there was a dance at the country home of Mr. Spiller. Appellant and deceased both attended it. Bullock was the floor master, or manager of the dance, and it was his business to collect from each of the young men who danced $1 to pay· for the music, which was the amount charged each one. After the dance had progressed some two hours or more, about 11 o'clock, Bullock approached appellant and asked him for his dollar. Appellant refused to pay it, claiming that he had danced only a short time. Several witnesses saw and heard what then occurred between the parties. This was in one of the rooms of the house. They both then walked from that room into the other room of the house where they had a short conversation about the same matter. Their conversation was not heard by any other witness. Appellant said while they were in the room he told Bullock he supposed he had danced only about thirty minutes and offered to pay Bullock a half dollar. Bullock refused this, saying to him, "If you are so damn short you won't pay a dollar, I won't take any." Appellant then invited Bullock out of the house to settle the matter.. They then at once went out of the house, appellant in the lead. It was a very dark night and very dark in the yard out of the house. As Bullock was going out he halted and delivered to some friend the money he had collected and other things out of his pocket, then walked out. Several witnesses testified, in effect, that not one word was spoken by either party when Bullock walked out. Several of them, all disinterested, swore that the moment Bullock stepped out on the ground appellant struck him a blow which felled him to his knees. Appellant said as Bullock reached the door going out, he, Bullock, couldn't see him, appellant, and said, "Where are you?" He replied, "Right here," and that Bullock came right out towards him, saying, "You bet I will come, all right." He admitted that he at once struck Bullock and knocked him to his knees. Appellant was a larger and heavier man than Bullock and admitted that a few years before he had taken boxing lessons. All the witnesses say that when Bullock was so knocked to his knees, he at once recovered himself, made at appellant, and he and appellant began fighting. There were two automobiles in front of Spiller's house close to the gallery off of which both parties had stepped when the fight commenced. In the fight at first, after clenching, in some way they fell against or one was pushed against one ·of the fenders of one of the automobiles. The parties present could not tell which one was against the automobile, but two of them pulled the parties, still clenched, away from the automobile, as one of them expresses it, so they could have a fair fight. Appellant threw Bullock down and was on top of him beating him and gouging his eyes. Each was fighting the other as much as he could. Soon Bullock called to the others to pull appellant off of him, some saying that he merely said, "Pull him off, boys"; others, that he said, "Pull the son-of-a-bitch off, boys." At any rate, two of the bystanders took hold of and pulled appellant off of Bullock, and pushed him back several feet, and held and restrained him. In the meantime, two others had pulled Bullock up and held and

were restraining him. The bystanders were then attempting to prevent any further fighting. After appellant was pulled off of Bullock, Bullock kicked him, perhaps in the face, and kicked at him. While he was still down, appellant also kicked Bullock in the face and kicked at him. After each was pulled up and each held by others to prevent any further fighting, Bullock tried to get to appellant and said repeatedly, "I will kill the son-of-a-bitch if it's the last thing I do, or the last act of my life." One of appellant's witnesses said he said damned bastard. When Bullock was saying this he was surging and maneuvering with his arms up, trying to get loose from those who held him. Wade Bartlett was one of the persons who at this time had hold of Bullock and with another one of the witnesses keeping him from appelland. Appellant then said, as Wade Bartlett testified, " 'Wade, he said he was going to kill me,' and when Crossett said that I turned and looked at him and saw him with his gun. I turned Bullock loose and went to Crossett and told Crossett not to shoot, that he (Bullock) didn't have anything. . . . Crossett was advancing toward Bullock at that time. . . . He was coming right towards Bullock and right towards me. I met him; went close enough to put my hand on him, did put my hand on him, on his right arm, and then he swung around this way. The gun fired about that time. . . . About the time the shot was fired I had hold of Crossett's arm; the first I noticed of Bullock after the first shot was fired, I know he was going up on the porch, running across the porch." This witness further testified that when he turned Bullock loose and went to appellant, that Bullock began backing off from appellant.

L. D. Tankersley testified that he had hold of Bullock when appellant shot at him the first time and that at that time Wade Bartlett had hold of appellant and Tankersley testified Bartlett said to appellant: " 'Don't shoot, he hasn't got anything.' After the first shot Bullock started to run, seemed like, and grabbed hold of me; I don't know just exactly where he grabbed me, he held my arms, I think. I think I was just about between him and Crossett at the time he took hold of me; I then tried to jerk loose and fell back against the car in the scuffle. Yes, I did get loose from him; after we fell back against the car and he got loose from me he jumped up on the gallery; that was before the second shot. . . . I regained my balance and stayed where I was; after the second shot I saw Crossett as he ran around the house; Bullock went around the house ahead of him. . . . I heard Crossett say something immediately before the firing of the first shot; he told them to look out, he was going to shoot. As near as I can remember, he told the boys to get out of the way, he was going to shoot. He did shoot; I can't tell exactly, it looked like the bullet came in the direction of me. I saw the fire from the gun, I saw the gun in Crossett's hand. . . . I heard Crossett say something else with reference to shooting Bullock; he said, 'You said you would kill me, now I will get my gun and kill you.' I don't remember whether he made that statement before telling the others to get out of the way, or said it afterwards. It was before

the first shot. . . . After the first shot fired I turned him loose and stepped back toward the car, and he grabbed me; I stepped to the right, and he grabbed me. I fell over against the automobile; I tried to jerk loose and in the scuffle fell against the car. . . . When I got up, Bullock jumped up on the gallery; it seemed as if he was going to go in one of the doors, and then he turned."

Mr. J. G. Crowley, one of appellant's witnesses, testified that just before appellant shot the first shot at Bullock, appellant said, "You heard what he said, boys; look out, I am going to shoot." And that just before this he heard Bartlett tell appellant not to shoot; that he heard him say, "Don't shoot him, don't shoot him."

Mr. J. B. Spiller, another one of appellant's witnesses, testified that he helped pull appellant off of Bullock and that he backed him back some four to six feet and the others took Bullock off some eight or ten feet. Further, "Before he drew his pistol he said, 'Look out, boys, you heard what he said; he says he is going to kill me; look out, I am going to shoot.' I had him by the left arm then, and jerked him; I believe Bullock ran back at the time he shot. . . . No, I did not turn Crossett loose at the time or after the first shot was fired; continued to hold him. After the first shot, the best I remember, Bullock ran backwards against the car; he was going west after the first shot; he ran up against the car at the corner of the porch."

On cross-examination, he said: "Before I turned Mr. Crossett loose he said, 'Turn me loose, friend.' . . . And after that he said, 'Look out, boys, I am going to shoot.' Yes, I asked him not to shoot. Yes, it seemed like some two or three others asked him not to shoot. I think I heard someone ask him not to shoot and tell him that Bullock didn't have anything."

The whole testimony, without any doubt, shows that when appellant first shot at Bullock that Bullock began trying to get out of the way and ran from appellant, first backing and trying to hold Tankersley between him and appellant, then running up on the gallery, as one of the witnesses stated, as if to go in the room. Then turned and ran off the east end of the front gallery and just about the time he was stepping off, appellant following him, shot at him a second time; that Bullock then ran around the house on the east side, running from appellant, and that appellant followed him up, fired the third shot when he was only about twelve feet distant from him, still following him and fired the fourth shot when Bullock, groaning, fell. The evidence further, without contradiction, shows that appellant did not shoot Bullock from the front; that only two balls struck him, both in the back,—one to the right, and the other to the left of the backbone; that each and both wounds were fatal. Evidently they were the last shots fired; that appellant immediately after deceased's shooting called for his father, who was at the party, and kept calling for him to come and get his horse for him; that his father came and got his horse, and he got on him and fled.

Mr. Nevils was a brother-in-law of Bullock and lived just 180 yards

east from Mr. Spiller's, where the shooting occurred. Mr. Nevils was at the party that night; was in one of the back rooms engaged in a game and just after the shooting his attention was called to it and he went out but saw none of it.

Both the wounds of Bullock were fatal. He died therefrom a few hours later. The evidence tends strongly to show that Bullock was wholly unarmed. He is not shown even to have had a pocketknife. Appellant was unlawfully armed with a pistol when he went to this party, kept it concealed on his person and with it shot and killed Bullock.

We have not attempted to give the evidence in full. We regard it as unnecessary. We have carefully read and studied it more than once. In our opinion, it was unquestionably sufficient to show murder, and the court did not err in submitting murder to the jury for a finding, nor did the jury err in finding him guilty of murder.

The court charged on murder and submitted that issue to the jury for a finding in a complete charge on the subject. There is no objection to it in any way by appellant, other or further than his claim that the evidence did not justify and the court should not have submitted murder at all.

The court also submitted manslaughter in every phase raised by the evidence and gave every one of appellant's charges on that subject. There is no objection on this score.

The only other question appellant raises is that he objects to the court's charge on his claimed self-defense and the refusal of the court to give his charge No. 2 on that subject. The court's charge to which appellant objects is as follows:

"A reasonable apprehension of death or great bodily harm will excuse a party in using all necessary force to protect his life or person, and it is not necessary that there should be actual danger, provided he acted upon a reasonable appearance of danger, as it appeared to him, and from his standpoint at the time and in such case the party acting under such real or apparent danger is in no event bound to retreat in order to avoid the necessity of killing his assailant. Now, if you find from the evidence that the defendant killed the said Warren Bullock, but further believe that the deceased, Warren Bullock, in the presence and hearing of the defendant, made a threat to take the life of the defendant, and if you further believe that the deceased thereafter advanced upon the defendant with an uplifted arm and that it reasonably appeared to the defendant that the deceased was attempting to execute said threat, and was attempting to assault defendant with a knife, and that in so believing the defendant shot at the deceased, and that deceased thereafter turned and ran in the direction towards his brother-in-law's house, and that the manner of the deceased, together with the threats of the deceased, caused the defendant to believe that the deceased was running to his brother-in-law's house for the purpose of getting a gun and returning and assaulting and killing the defendant, then the defendant would not be required under the law to wait until the de-

ceased had returned with the gun, but would have the right to slay the deceased in his own defense, and it is not necessary that the deceased should have been running for the purpose of getting a gun, but if from the manner of said threat, coupled with the words and acts of the deceased, it reasonably appeared to the defendant, viewed from his standpoint, that the deceased was running for the purpose of getting a gun, and returning and slaying the defendant, then he would have the right to kill the deceased, and if you find from the evidence that the defendant killed the deceased under the circumstances above detailed, or if you have a reasonable doubt as to whether or not defendant killed the deceased under the circumstances above detailed, you will acquit the defendant."

This cause was tried in March, 1914, long after the Act of April 5, 1913, page 278, amending articles 735, 737 and 743, and adding 737a, were in force. In compliance with that Act, after the evidence was closed and before the argument began, the court submitted the charge to appellant and his attorneys. No specific objection whatever, at that time, nor until the motion for new trial was filed, was made to said paragraph of the court's charge copied above. He only objected to the court submitting, as stated above, murder to the jury for a finding. The only other objection there is, in any way pertaining to the charge of the court by appellant, is this: "The defendant excepts to the action of the court in not giving his special charges No. 1 and No. 2 and No. 3, and in not giving in charge to the jury in his main charge the principles of law contained in said special refused charge." What his charges in No. 1 and No. 3 were is in no way shown in this record. Under all of the authorities prior to said Act of April 5, 1913, his assignment on this subject could not be considered by this court. Byrd v. State, 69 Texas Crim. Rep., 35, 151 S. W. Rep., 1068, and cases therein cited; Ryan v. State, 64 Texas Crim. Rep., 628, 142 S. W. Rep., 878; Berg v. State, 64 Texas Crim. Rep., 612, 142 S. W. Rep., 884, and a long list of cases unnecessary to collate.

In our opinion the judge of the lower court could not have understood from appellant's said objection to his charge that he objected to the court's charge herein above copied on any such grounds as he afterwards set up, for the first time, in his motion for new trial. The court by his indorsement in refusing appellant's said special charge No. 2 shows this, for he said, "Refused because incorporated substantially in the main charge." Appellant's said special charge No. 2 is as follows:

"Gentlemen of the jury: You are instructed that if you find from the evidence in this case that the deceased, Warren Bullock, in the presence and hearing of the defendant, Thad G. Crossett, threatened to kill the defendant, Thad G. Crossett, and if you further find from the evidence that it reasonably appeared to the defendant, Thad G. Crossett, from the words and acts and conduct of the deceased, Warren Bullock, that he, the said Warren Bullock, was about to execute said threat, and take the life of the defendant, then the defendant would be justifiable in law in shooting and killing the said Warren Bullock, and the defend-

ant would have the right under the law to continue to shoot the said Warren Bullock as long as it reasonably appeared to the defendant that the said Warren Bullock was seeking to execute the said threat, and if you find that the defendant killed the deceased, Bullock, in the way and manner above detailed, you will acquit the defendant, and return a verdict of not guilty."

In this connection and practically covering the same ground the court gave appellant's special charge No. 4, as follows:

"Gentlemen of the jury, you are instructed that if you find from the evidence that the defendant, Thad G. Crossett, and the deceased, Warren Bullock, mutually entered into an agreement to fight with their fists, and that the defendant intended at the time to do no more than to have an ordinary fist fight with the deceased, and that after the fight, if any, was ended by the parties being separated or otherwise that the defendant then and there abandoned the difficulty, and ceased fighting, and thereafter the deceased in the presence and hearing of the defendant threatened to take the life of the defendant and that from the acts and words and conduct of the deceased, Warren Bullock, at the time he made said threat and thereafter it reasonably appeared to the defendant that he was about to execute said threat and was attempting to get a weapon with which to kill the defendant, then the defendant would have the right under the law to kill the deceased in his own right of self-defense and would have the right to continue to shoot so long as it reasonably appeared to the defendant, that the deceased was attempting to get a weapon with which to return and assault and kill the defendant, and this would be true even though you should find that defendant struck the first lick, and if you have a reasonable doubt as to whether or not the defendant killed the deceased under the circumstances aforesaid, you will return a verdict of 'not guilty.'"

This charge, No. 2, seems to have embraced another entirely separate and distinct paragraph, presenting another matter. Clearly this latter part was fully embraced by the court's charge and we think it unnecessary to copy that in connection with the above.

The object of the Legislature as shown by said Act of April 5, 1913, amending said articles above specified was that whatever objections an accused on trial, had to the court's charge should be distinctly then and there pointed out so as to give the judge an opportunity to correct his charge, if the objections were at all applicable. In other words, the object and intention of the Legislature was that an accused on trial must aid the lower court in giving a correct charge, instead of waylaying him, taking chances of an acquittal and then securing a reversal, as had theretofore been the case, by making objections for the first time to the charge of the court after the trial was concluded. But suppose it could be held that appellant's said objections to the charge of the court above quoted and the request to give his said special charge No. 2, raised any valid objection to the court's charge now objected to and for the first time specifically pointed out in the motion for new trial, then, in our opinion, no error whatever which would authorize or justify this

court to reverse, is shown. In the first place, the charge of the court, as given, was correct and applicable directly to the evidence; that is, so far as appellant's rights are concerned. It is against the State. The State might have cause of complaint. Appellant himself testified that deceased, Bullock, threatened to kill him and started towards him with his raised hand, in which he thought he had a knife to kill him when he first shot at him and when he started east, as he did, he thought he was going to his brother-in-law's to get a gun and kill him.

The case of McMillan v. State, 73 Texas Crim. Rep., 343, 165 S. W. Rep., 576, and cases cited therein and relied upon by appellant, in our opinion, are not in point. In the McMillan case the court incumbered appellant's right of self-defense with several wholly distinct, unimportant and contested questions of fact. In this case no such appears. Everything that the court called attention to in submitting his charge in appellant's favor on self-defense was called for by the evidence, was material and in point.

Besides this, appellant's said special charge No. 2, above copied, simply and solely lays down abstract propositions. It does not apply the law to the facts adduced on the trial. Such general charges have always been condemned by this court, and where charges by the court apply the law to the specific facts made by the evidence they have always been commended by this court. See section 799, White's Ann. C. C. P. So that, in our opinion, first, the court's charge now objected to was correct and applicable to the facts in this case; second, no such objection was made in time in the lower court, if the charge was wrong, that can be considered, under the law, by this court. The objection was made too late in the court below; third, appellant's charge No. 2 should not have been given because it is a mere general abstract proposition not applied to the facts in evidence in this case; and, fourth, his special charge No. 4, which was given, embraced substantially in general terms, what his charge No. 2 contained. And, taking the whole charges together, the issue presented by appellant was sufficiently presented to the jury.

There is no reversible error presented in this record and the judgment will be affirmed.

*Affirmed.*